**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| SHIRLEY KIM WATT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 4:14-CV-1473 CAS |
| | ) |
| MEGAN BRENNAN, POSTMASTER | ) |
| GENERAL, UNITED STATES POSTAL | ) |
| SERVICE, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on motions for summary judgment filed by pro se plaintiff Shirley M. Watt and defendant Megan Brennan, Postmaster General. Defendant opposes plaintiff's motion. Plaintiff was granted additional time, until September 1, 2015, to file her opposition to defendant's motion but she has not filed an opposition and the time to do so has passed. As a result, the motions are ready for decision. For the following reasons, the Court will grant defendant's motion for summary judgment and deny plaintiff's motion.

## I. Background

Plaintiff, a former employee of the United States Postal Service, filed a complaint with the United States Postal Service ("USPS") alleging that it discriminated against her on the bases of her race (African-American) and disability (stress) when she was removed from her Human Resources Specialist position effective January 28, 2012. The USPS's final decision found no discrimination had occurred. Plaintiff appealed the USPS's decision to the United States Equal Employment Opportunity Commission ("EEOC"), which affirmed. The EEOC found that USPS articulated a legitimate, nondiscriminatory reason for its actions – plaintiff had been absent without official leave

since December 5, 2011 and had failed to provide acceptable documentation for her absence – and

that plaintiff failed to prove by a preponderance of the evidence that the USPS's reason was a pretext

for race or disability discrimination.  Plaintiff sought reconsideration of the EEOC's decision, but

reconsideration was denied and the EEOC's decision stood.

Plaintiff filed her Complaint in this Court alleging she was discriminated against between

January 2, 2012 and March 23, 2013 on the basis of her race (African-American) and disability

(stress) under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701 et seq., and was

harassed by her supervisors' actions in sending her disciplinary letters.[1]  Plaintiff alleges that

defendant terminated her employment and failed to accommodate her disability.

## II.  Summary Judgment Standard

The standards applicable to summary judgment motions are well settled.  Pursuant to Federal

Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the

information before the court shows "there is no genuine issue of material fact and the moving party

is entitled to judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The Eighth Circuit has articulated the appropriate standard for consideration of motions for

summary judgment, including those filed in employment discrimination cases, as follows:

Summary judgment is proper if the pleadings, the discovery and disclosure materials
on file, and any affidavits show that there is no genuine issue as to any material fact
and that the movant is entitled to judgment as a matter of law.  The movant bears the

---

[1]Although plaintiff's Complaint does not state that her claim of race discrimination is
brought pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), the Court
liberally construes the Complaint to assert a claim under Section 17 of Title VII, 42 U.S.C. §
2000e-16, which prohibits discrimination in the federal sector on the basis of race, color, religion,
sex and national origin.  42 U.S.C. § 2000e-16(a).  "When we say that a pro se complaint should be
given liberal construction, we mean that if the essence of an allegation is discernible, . . . then the
district court should construe the complaint in a way that permits the layperson's claim to be
considered within the proper legal framework."  Stone v. Harry, 364 F.3d 912, 915 (8th Cir. 2004).

initial responsibility of informing the district court of the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (internal citations and quotation marks omitted).

Where, as here, parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine dispute of material fact exists and whether the movant is entitled to judgment as a matter of law. Husinga v. Federal-Mogul Ignition Co., 519 F.Supp.2d 929, 942 (S.D. Iowa 2007); see 10A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure § 2720 at 332 (3rd ed. 1998).

With the foregoing standards in mind, the Court accepts the following facts as true for purposes of resolving this motion for summary judgment.

## III. Findings of Fact[2]

---

[2]The Court adopts defendant's Statement of Uncontroverted Material Facts, which is supported by exhibits and the Declaration of Kathleen Spirk. Plaintiff has not disputed defendant's statement of facts. Because plaintiff failed to submit a responsive statement of material facts as to which she contends a genuine issue exists, as required by Local Rule 4.01(E), for purposes of this motion plaintiff is deemed to have admitted all facts which were not specifically controverted. See Deichmann v. Boeing Co., 36 F.Supp.2d 1166, 1168 (E.D. Mo. 1999); Ridpath v. Pederson, 407 F.3d 934, 936 (8th Cir. 2005) (where plaintiff did not controvert defendant's statement of material fact, it was deemed admitted under E. D. Mo. Local Rule 4.01(E)). Further, as discussed below, plaintiff did not submit a statement of material facts in support of her own motion for summary judgment.

1.  Plaintiff Shirley Kim Watt ("Watt" or "plaintiff") began working for the USPS in July 1980.  Ex. J, Deposition of Shirley Watt, at 6:13-14, 8:25-9:3.

2.  Watt held a variety of positions with USPS throughout her employment, including working as a Human Resources Specialist during her last fifteen years with USPS.  Ex. J at 9:4-10:23.

3.  The functional purpose of a Human Resources Specialist is to perform technical staff work in support of the implementation and administration of one or more human resources programs. Ex. J at 13:13-13:21; Ex. A, Job Description.

4.  There were seven different programs or units within Human Resources, all of which are all included in the job description for the Human Resources Specialist position.  Ex. J at 13:15-13:21; Ex. A.

5.  For the majority of Watt's time as a Human Resources Specialist, she was assigned to work in the Postal Employee Development Center ("PEDC"), which is the training unit for Postal employees.  Ex. J at 10:2-10:9.

6.  The job duties for Human Resources Specialists assigned to PEDC, listed in paragraph 8 of the job description, include planning, scheduling, implementing, and administering employee training, conducting workshops and orientations, and providing guidance to employees and job trainers.  Ex. J at 13:15-13:23, 14:9-14:12, 15:11-15:13; Ex. A.

7.  In January 2009, Watt's assignment as a Human Resources Specialist changed so that she was assigned to work half of the day in PEDC and the other half of the day in the Personnel Services unit ("Personnel").  Ex. J at 19:25-20:11, 26:19-26:22.

8. The job duties for Human Resources Specialists that are assigned to Personnel, which are listed in paragraph 1 of the job description, include implementing and administering employee compensation and benefits programs. Ex. J at 13:24-14:8; 20:21-21:15.

9. Watt's primary responsibility in Personnel was to administer the eReassign program, which coordinated the transfer of employees to different offices, states, and positions. Ex. J at 20:21-21:15, 22:15-23:10.

10. The eReassign duties are not listed in the job description because it was a newer program that postdates the job description. Ex. J at 20:21-21:15.

11. Regular attendance is a required job duty of a Human Resources Specialist. Ex. J at 15:14-15:18.

12. Concentration is a required job duty of a Human Resources Specialist. Ex. J at 15:19-15:22.

13. Human Resources Specialists are required to be able to use and rely on their memory as a skill. Ex. J at 15:23-16:1.

14. Watt testified that she began to experience stress from her job, there was too much pressure, and she needed time off to "get [her] bearings back," so she went to her primary care doctor, Dr. Bernard Shore, who told her something was wrong and directed her to see a therapist. Ex. J at 29:18-30:11.

15. Watt saw Dr. Steven Haymon, a therapist, on January 24, 2011. Ex. J at 30:12-30:19.

16. Watt testified that she "broke down" while she was talking to Dr. Haymon during her appointment and he gave her a doctor's note and told her not to go back to work. Ex. J at 30:23-32:15.

17.   Dr. Haymon diagnosed Watt with depression and anxiety, which Watt refers to as "stress."  Ex. J at 34:4-35:4.

18.   On January 24, 2011, Dr. Haymon wrote a note stating that Watt was unable to attend work from January 24, 2011 to February 21, 2011 due to medical reasons and would return to work on February 22, 2011.  Ex. J at 35:11-35:22, 36:23-36:25; Ex. B, Dr. Haymon Records.

19.   On a monthly basis, from February 28, 2011 through June 3, 2011, Dr. Haymon wrote notes indicating that Watt was unable to attend work but would return to work the following month. Ex. J at 37:20-37:25; Ex. B at 2-4.

20.   Watt never returned to work.  Ex. J at 46:9-46:21.

21.   Watt's absences were covered by FMLA for 12 weeks from January 24, 2011 until June 10, 2011.  Ex. J at 37:11-38:4.

22.   Watt applied for disability retirement on May 23, 2011.  Ex. J at 99:1-99:23; Ex. T, Watt's Disability Retirement Application.

23.   Watt applied for disability retirement because her therapist encouraged her to and because she believed in good faith that she met the requirements for being considered disabled enough to receive disability retirement benefits.  Ex. J at 100:2-101:3.

24.   On July 1, 2011, Vanessa Lucas, the Acting Manager of PEDC at the time, sent Watt a letter informing her that she was scheduled for a pre-disciplinary interview ("PDI") on July 7, 2011. Ex. J at 50:11-51:7; Ex. C, PDI Letter dated 7/1/2011.

25.  A PDI is a meeting between a manager and employee in which the manager speaks with the employee about his or her behavior prior to the imposition of any disciplinary action.  Ex. J at 50:1-50:7.

26. Watt did not attend any of the PDIs that were scheduled by her managers because Dr. Haymon told her to avoid communications with her managers, so on July 29, 2011, Watt gave a representative from the National Association of Postal Supervisors ("NAPS") authority to act on her behalf. Ex. J at 51:8-52:11, 53:1-53:3; Ex. E.

27. Watt does not know if the NAPS representative attended any of the PDIs; she "left that to him." Ex. J at 51:23-52:11.

28. On July 25, 2011, Kathleen Spirk, who replaced Lucas as the Acting Manager of PEDC, sent Watt a Letter of Warning for failure to maintain a regular work schedule based on unscheduled absences from June 6, 2011 to July 15, 2011. Ex. J at 54:2-54:20; Ex. D, Letter of Warning; Ex. V, Declaration of Kathleen Spirk.

29. In her deposition, Watt agreed that she did not work on the days identified in the Letter of Warning. Ex. J at 54:21-54:23.

30. On July 26, 2011, Dr. Haymon wrote a note stating that Watt was unable to attend work from June 5, 2011 to August 31, 2011 due to medical reasons and would return to work on September 1, 2011. Ex. B at 5.

31. On July 29, 2011, Watt responded in writing to Spirk and Lucas stating that she was not accepting any disciplinary action. Ex. J at 55:20-56:9, 57:3-57:10; Ex. E, Letter from Watt dated 7/29/2011.

32. On August 16, 2011, Dr. Haymon wrote a letter stating that Watt was incapacitated and unable to perform any of her essential job functions and that he was requesting that her return to work date be extended to September 30, 2011. Ex. B at 6.

33. On August 31, 2011, Spirk sent Watt a letter informing her that she was scheduled for a PDI on September 8, 2011. Ex. J at 59:18-60:3; Ex. F, PDI Letter dated 8/31/2011.

34. On September 27, 2011, Dr. Haymon wrote a note stating that Watt was unable to attend work from October 1, 2011 to October 31, 2011 due to medical reasons and would return to work on November 1, 2011. Ex. B at 7.

35. On September 29, 2011, Spirk sent Watt a letter informing her that she was issuing Watt a Proposed Letter of Warning in Lieu of Time-Off Suspension for failing to maintain a regular work schedule from July 26, 2011 to September 8, 2011 due to her unscheduled absences. Ex. J at 61:8-62:9; Ex. G, Proposed Letter of Warning in Lieu of Time-Off Suspension.

36. In her deposition, Watt agreed that she was using sick leave on the dates identified in the Proposed Letter of Warning in Lieu of Time-Off Suspension. Ex. J at 62:3-62:6.

37. On October 7, 2011, Pamela Meehan, the Human Resources Manager, sent Watt a letter informing her that the Letter of Warning in Lieu of Time-Off Suspension would be upheld because the absences identified in the letter were extensive, ongoing, and not protected by FMLA. Ex. J at 64:7-64:23; Ex. H, Step A Decision Letter.

38. On October 27, 2011, Spirk sent Watt a letter informing her that a PDI had been scheduled for November 4, 2011. Ex. J at 65:6-65:14; Ex. I, PDI Letter dated 10/27/2011.

39. On November 1, 2011, Dr. Haymon wrote a note stating that Watt was unable to attend work from November 1, 2011 to November 30, 2011 due to medical reasons and would return to work on December 1, 2011. Ex. B at 8.

40. Watt did not attend the PDI on November 4, 2011. Ex. J at 66:3-66:10.

41. On December 7, 2011, Spirk sent Watt a letter informing her that a PDI had been scheduled for December 15, 2011. Ex. J at 67:17-68:1; Ex. K, PDI Letter dated 12/7/2011.

42. Watt did not attend the PDI that was scheduled for December 15, 2011. Ex. J at 68:2-68:4.

43. On December 7, 2011, Spirk sent Watt a letter informing her that USPS had not received acceptable documentation of her continued absence because the last medical statement covered the month of November and indicated that Watt would return to work on December 1, 2011 but Watt had not yet reported back to work. Ex. J at 70:2-71:24; Ex. L, Certificate of Absence.

44. In the December 7, 2011 letter, Spirk also requested that Watt submit medical documentation that contains an explanation of the nature and duration of Watt's illness or injury sufficient to indicate that she was unable to perform her job duties during her entire period of absence. Ex. L.

45. In the December 7, 2011 letter, Spirk stated that Watt must provide the requested medical documentation within seven days and that failure to provide it would result in discipline up to and including Watt's removal from USPS. Ex. L.

46. On December 13, 2011, Dr. Haymon wrote a note stating that Watt was unable to attend work from December 1, 2011 to December 31, 2011 due to medical reasons and would return to work on January 1, 2012. Ex. B at 9.

47. Watt agreed that the note from Dr. Haymon dated December 13, 2011 does not say anything specific about the nature or duration or her illness nor does it contain any specific information about accommodations or restrictions she might need to perform her job as a Human Resources Specialist. Ex. J at 77:14-77:24; Ex. B at 9.

48. Watt agreed that she was absent during the time period identified in the December 7, 2011 letter and that the note from Dr. Haymon covering the month of December was not sent until December 13, 2011. Ex. J at 71:7-71:14, 72:11-73:14; Ex. L.

49. Watt agreed that there was no reference to her race in the letter sent by Spirk on December 7, 2011. Ex. J at 80:13-80:24; Ex. L.

50. On December 23, 2011, Spirk sent Watt a letter stating that she was providing Watt with advance written notice that Spirk had proposed to remove Watt from USPS for failing to follow proper leave requesting procedures, which put her in absent without official leave ("AWOL") status, and for failing to follow instructions. Ex. M, Notice of Proposed Removal, at 1.

51. With regard to the charge that Watt failed to follow proper leave requesting procedures, Spirk indicated that Watt failed to report to work on December 1, 2011 as stipulated by her medical documentation and still had not provided Spirk with proper documentation as directed in the December 7, 2011 letter. Ex. M at 1.

52. With regard to the charge that Watt failed to follow proper leave requesting procedures, Spirk also indicated that the December 13, 2011 note from Dr. Haymon was considered to be unacceptable pursuant to USPS policy; therefore, Watt's absence was being changed to leave without pay and she was considered to be AWOL. Ex. M at 1.

53. Spirk noted that Watt failed to meet USPS' requirement that she maintain her assigned schedule and make every effort to avoid absences. Ex. M at 1.

54. Spirk further stated in the Notice of Proposed Removal that Watt's current record of being AWOL burdened USPS, which had to replace her during her absences causing increased costs, and negatively and severely impacted USPS through reduction of productivity, disruption of schedules, coverage by other personnel, and morale problems. Ex. M at 1-2.

55. Spirk stated that Watt's actions violated the following provisions of the Employee and Labor Relations Manual: Sections 511.41, 511.43, 513.362, 513.363, 513.364, 513.365, 513.64, 665.41, and 665.42. Ex. M at 2-3.

56. Finally, Spirk informed Watt that she or her representative could request that the proposed removal be mediated or could appeal the action. Ex. M at 4-5.

57. On December 27, 2011, Dr. Haymon wrote a note stating that Watt was unable to attend work from January 1, 2012 to January 31, 2012 due to medical reasons and would return to work on February 1, 2012. Ex. B at 10.

58. On January 4, 2012, Dr. Haymon wrote a letter stating that Watt had been under his care since January 24, 2011, that she was currently waiting for Long Term Disability because of her chronic condition, and that it was "palpable that she will not be returning to work for the next six months; however probably not returning to work because her conditions are permanent." Ex. J at 42:3-42:16; Ex. B at 11.

59. On January 5, 2012, Watt wrote a letter to Spirk stating that her doctor was going to provide the requested documentation. Ex. J at 81:24-82:9; Ex. N, Letter dated 1/5/2012.

60. On January 6, 2012, USPS Human Resources Manager Meehan sent Watt a letter acknowledging Watt's appeal of the issuance of the Notice of Proposed Removal and informing Watt that she had decided to uphold the proposed removal, which would be effective January 2, 2012. Ex. J at 83:16-84:2; Ex. O, Letter of Decision.

61. On February 2, 2012, Meehan sent Watt an Amended Letter of Decision informing her that the proposed removal would now be effective January 28, 2012. Ex. J at 84:3-84:23; Ex. P, Amended Letter of Decision.

62. Meehan stated that she decided to uphold the Notice of Proposed Removal because Watt was AWOL and failed to follow instructions of her supervisors, which put her in violation of Sections 665.15, 665.41, and 665.4 of the Employee and Labor Relations Manual. Ex. P at 1.

63. Meehan further stated that she considered Watt's years of service, the seriousness of the charges against Watt, as well as discipline administered against other employees for similar misconduct. Ex. P at 1.

64. Finally, Meehan informed Watt of the opportunity to appeal her decision. Ex. P at 2.

65. Watt agreed that the Amended Letter of Decision did not reference her race or disabilities. Ex. J at 85:17-85:24.

66. Watt appealed the proposed removal action against her. Ex. J at 111:9-111:19.

67. On February 7, 2012, Dr. Haymon wrote a letter stating that Watt was unable to attend work from February 1, 2012 to February 29, 2012 due to medical reasons and would return to work on March 1, 2012. Ex. B at 12.

68. On February 28, 2012, Dr. Haymon wrote a note stating that Watt was unable to attend work from March 1, 2012 to March 31, 2012 due to medical reasons and would return to work on April 1, 2012. Ex. J at 39:7-39:19; Ex. B at 13.

69. In March 2012, Watt's application for disability retirement was granted. Ex. J at 101:4-101:25; Ex. Q, Letter from Office of Personnel Management.

70. Watt was still employed by USPS when her application for disability retirement was granted. Ex. J at 111:9-112:6; Ex. Q at 1.

71. Watt was not fired or removed from USPS. Ex. J at 112:4-112:6.

72. On April 14, 2012, Watt filed an EEO Complaint of Discrimination against the Postal Service alleging that she was discriminated against based on her race and disability on December 23, 2011, January 7, 2012, and February 2, 2012. Ex. J at 88:7-89:11; Ex. R, EEO Complaint, at 1; Doc. 1-1 at 1.

73. The dates of December 23, 2011, January 7, 2012, and February 2, 2012 that Watt identified in her EEO Complaint are the dates that the Notice of Proposed Removal, Letter of Decision, and Amended Letter of Decision were issued. Ex. J at 89:12-89:18; Exs. M, O, P.

74. Watt's EEO Investigative Affidavit states that the accepted issue under investigation was: "alleged discrimination based on race (African-American) and disability (stress) when: on February 2, 2012, she received an amended letter of decision upholding her proposed removal effective January 28, 2012." Ex. S, Watt's EEO Investigative Affidavit, at 1; Doc. 1-1 at 1.

75. In her EEO Investigative Affidavit, which was signed under the penalty of perjury, Watt stated that she was unable to perform the required functions and duties of her position with or without an accommodation. Ex. J at 95:13-96:3; Ex. S at 10.

76. Watt testified that she was unable to perform the functions and duties of her job because "you have to be sharp" and she felt that her mind "was not there." Ex. J at 96:4-96:13.

77. Watt further testified she could not perform her job as a Human Resources Specialist because her concentration is bad, she is forgetful, she has a hard time remembering things, and problems with her digestive system prevent her from instructing classes because she constantly has to use the restroom. Ex. J at 96:14-97:6; Ex. S at 10.

78. Watt testified that she was unaware of any other positions that she could have performed with her disabilities. Ex. J at 97:7-97:15.

79. The monthly notes that Dr. Haymon wrote for Watt did not contain any references to restrictions or accommodations. Ex. J at 39:20-39:24; Ex. B.

80. Watt testified that Dr. Haymon did not think it would be good for her to go back to work between January of 2011 and March of 2012. Ex. J at 40:9-41:9.

81. In her EEO Investigative Affidavit, Watt stated that she would not need any accommodations to perform the duties of her position because her mind is not where is should be to be an instructor and her body functions would not let her perform her duties. Ex. J at 97:16-98:6; Ex. S at 11.

13

82.   However, in her disability retirement application, Watt stated that she asked for accommodations in the form of being placed back into her original assignment of working in PEDC only and not working in Personnel and in the form of being placed on a "higher level," which essentially involved a promotion and pay raise.  Ex. J at 106:13-107:5; 108:8-109:15; Ex. T, Application for Disability Retirement.

83.   Watt did not provide her managers with a note from her doctor stating that she should only be assigned to PEDC or be placed at Level 21 as an accommodation.  Ex. J at 110:11-111:8.

84.   Watt last physically worked for USPS on January 24, 2011.  Ex. J at 46:9-46:16.

85.   Even though each note from Dr. Haymon stated that Watt would return to work the following month, Watt did not return to work.  Ex. J at 38:23-39:1.

86.  Watt did not physically work for USPS between January 24, 2011 and the date she began receiving disability retirement.  Ex. J at 46:17-46:21.

87.   In her EEO filings, Watt alleged that she believed her race was a factor in her removal because employees named Mark Ott and Ruth Indocofer, who were both Caucasian, were off on sick leave longer than her and were not issued removal letters.  Ex. J at 112:21-113:11; Ex. R at 1; Ex. S at 13.

88.   In her deposition, Watt also alleged that an employee named Gary Forrester, who was Caucasian, was off work for a longer period of time and was not issued a removal letter.  Ex. J at 112:21-113:21.

89.   Ott and Indocofer had different job titles and positions than Watt; Ott worked as the Manager of Labor Relations and Indocofer was a Postmaster in St. Charles, Missouri.  Ex. J at 114:4-114:10, 115:13-115:16.

90. Spirk did not supervise Ott or Indocofer.[3] Ex. U, Spirk's EEO Investigative Affidavit.

91. Forrester worked as a Human Resources Specialist in PEDC. Ex. J at 114:11-114:13.

92. Forrester returned to work after being out on sick leave for a period of time. Ex. V.

93. Forrester retired from USPS on December 31, 2010. Ex. V.

94. Spirk only supervised Forrester from December 4, 2010 to December 31, 2010. Ex. V.

95. Spirk was not involved in approving Forrester's use of sick leave because she was not his supervisor when he was out on sick leave. Ex. V.

96. Watt testified there was nothing else other than the fact that Ott, Indocofer and Forrester were Caucasian and she is African-American that caused her to believe her race played a role in the attempt to remove her. Ex. J at 116:22-117:9.

97. When asked in her deposition whether there was anything that made Watt think the alleged harassment was related to her race, Watt testified,

> I can't say per se. I just don't – I think it's the position. I can't say that she was doing it to me because I was black. I can't say that. I – I think she wanted the position, and if I think in terms of race is if she fired me and hired someone white, then I could say it, she could have fired me and hired somebody black, so I don't – I can't – I can't really say.

Ex. J at 120:19-121:3.

98. The Notice of Proposed Removal and Letter of Decision upholding the proposed removal do not contain any specific references to Watt's disability or diagnoses. Ex. J at 80:6-80:12, 85:21-85:24; Exs. M, O, P.

99. Watt never mentioned her diagnosis of depression to Spirk. Ex. J at 44:7-45:11.

---

[3]Spirk's EEO Investigative Affidavit indicates that this employee's name is actually spelled "Intlecofer". Ex. U at 6. For purposes of this opinion, however, the Court will use the name as spelled by plaintiff.

100. When speaking with Spirk, Watt might have told Spirk that she was "anxious, anxiety, stressed," "just couldn't handle it," that it was "too much for [her]." Ex. J at 44:7-45:11.

101. Spirk only learned of Watt's anxiety and depression diagnoses after she issued the Notice of Proposed Removal. Ex. U.

102. Watt is "quite sure" she would have told Meehan that she had been diagnosed with depression and anxiety after Meehan issued the letter upholding the proposed removal. Ex. J at 45:12-46:8.

103. Watt's pay stayed the same during 2011 when she was out on sick leave and she was not demoted during that time. Ex. J at 125:22-126:3.

## IV. Discussion

### A. Plaintiff's Motion for Summary Judgment

Plaintiff's two-page motion for summary judgment contains conclusory assertions that she has proved her prima facie case, but the motion is devoid of any citation to case law or supporting evidence to establish a prima facie case of discrimination under either the Rehabilitation Act or Title VII. Plaintiff fails to meet her initial burden on summary judgment to show that there are no genuine issues of material fact and that she is entitled to judgment as a matter of law. See Celotex, 477 U.S. at 322 (1986). In addition, plaintiff's motion for summary judgment fails to comply with Local Rules 4.01(A) and 4.01(E) because it is not accompanied by a memorandum in support and a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, supported by appropriate citations.[4]

---

[4]Plaintiff's pro se status does not excuse her from compliance with the Federal Rules of Civil Procedure or the Eastern District of Missouri's Local Rules. See Bennett v. Dr. Pepper/Seven Up, Inc., 295 F.3d 805, 808 (8th Cir. 2002) (a pro se litigant is not excused from complying with court orders or substantive and procedural law "even without affirmative notice of the application of the

Because plaintiff's motion for summary judgment does not contain any evidence or arguments that support the entry of judgment in her favor on any of her claims, the motion will be denied.

B. <u>Defendant's Motion for Summary Judgment on Plaintiff's Disability Discrimination Claim</u>

The Rehabilitation Act provides a private cause of action to persons subjected to disability discrimination by the federal government and its agencies, including in employment activities. <u>Gardner v. Morris</u>, 752 F.2d 1271, 1277 (8th Cir. 1985). The Rehabilitation Act prohibits discrimination against an "otherwise qualified individual with a disability . . . , solely by reason of her or his disability." 29 U.S.C. § 794. The Rehabilitation Act incorporates the standards of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 <u>et seq.</u> ("ADA") to determine whether a violation has occurred. 29 U.S.C. § 794(d); <u>Peebles v. Potter</u>, 354 F.3d 761, 765 (8th Cir. 2004). Thus, as relevant to plaintiff's claims, decisions interpreting either the Rehabilitation Act or the ADA "are applicable and 'interchangeable' to claims under each statute." <u>Hill v. Walker</u>, 737 F.3d 1209, 1216 (8th Cir. 2013).

"Discrimination under the ADA and the Rehabilitation Act encompasses both disparate treatment because of a disability and failure to provide reasonable accommodations to a qualified individual's known disability." <u>Withers v. Johnson</u>, 763 F.3d 998, 1003 (8th Cir. 2014) (citing <u>Hill</u>, 737 F.3d at 1216-17). Defendant moves for summary judgment on plaintiff's disability discrimination claim on the bases that plaintiff (1) is not a qualified individual under the Rehabilitation Act, (2) did not suffer an adverse employment action, and (3) was not denied a reasonable accommodation.

---

rules to his case.").

*1. Plaintiff is not a Qualified Individual Under the Rehabilitation Act*

Under the Rehabilitation Act, a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Defendant argues that plaintiff was not qualified to do the essential functions of her job as a Human Resources Specialist with or without a reasonable accommodation because, according to plaintiff's own testimony and her therapist's excusal notes, plaintiff's disability prevented her from performing her job duties altogether:

> In Watt's EEO Investigative Affidavit, which was signed under the penalty of perjury, she stated that she was unable to perform the required functions and duties of her position with or without an accommodation. Ex. J at 95:13-96:3; Exhibit S, Watt's EEO Investigative Affidavit, at 10. Watt testified in her deposition that she was unable to perform the functions and duties of her job because "you have to be sharp" and she felt that her mind "was not there." Ex. J at 96:4-96:13. Watt further stated that she could not perform her job as a Human Resources Specialist because her concentration is bad, she is forgetful, she has a hard time remembering things, and her problems with her digestive system would prevent her from instructing classes because she constantly has to use the restroom. Ex. J at 96:14-97:6; Ex. S at 10. Dr. Haymon wrote notes to her employer for fifteen consecutive months stating that she was unable to work and opined that she would probably not return to work because her conditions were permanent. Ex. J at 42:3-42:16; Ex. B. Watt agreed in her deposition that regular attendance, concentration, and use and reliance on memory are required job duties for Human Resources Specialists, each of which she was unable to perform. Ex. J at 15:14-16:1, 46:9-46:21, 96:14-97:6. Watt's admission that she could not perform her job at all, along with Dr. Haymon's records, makes it impossible for her to show that she could have performed the essential duties of her job, even with an accommodation.

Def.'s Mem. Supp. Mot. Summ. J. at 4.

"Summary judgment is proper if a plaintiff fails to establish any element of his or her prima facie case." Nesser v. Trans World Airlines, Inc., 160 F.3d 442, 445 (8th Cir. 1998). Plaintiff's discrimination claim fails because she does not make a prima facie showing that she was a qualified individual under the Rehabilitation Act. Plaintiff did not appear for work for a period of fifteen consecutive months, and her doctor's notes stated she was unable to work and opined that she was

unlikely to return because her conditions were permanent. Plaintiff testified that she could not perform her required job duties. "Attendance at work is a necessary job function." Epps v. City of Pine Lawn, 353 F.3d 588, 593 n.5 (8th Cir. 2003). "An employee who is 'unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones.'" Nesser, 160 F.3d at 445 (quoted case omitted).

Although attendance is an essential function of the job, employers must reasonably accommodate the disability, unless the accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A). The employee must show that a reasonable accommodation was available. Nesser, 160 F.3d at 446. Here, plaintiff fails to show that a reasonable accommodation existed. An "essential function of any government job is an ability to appear for work . . . and to complete assigned tasks within a reasonable period of time." Carr v. Reno, 23 F.3d 525, 530 (D.C. Cir. 1994). It is uncontroverted that plaintiff did not appear for work for over a year, and her doctor's notes stated she was unable to work. Defendant introduced evidence that plaintiff's inability to attend work burdened USPS, as it had to replace plaintiff during her absences. This caused USPS to incur increased costs, and it was negatively and severely impacted through reduction of productivity, disruption of schedules, coverage of plaintiff's duties by other personnel, and resulting morale problems.

"Where an employer shows that regular work is an essential function of a job, a plaintiff's failure to show she can work defeats her disability discrimination claim." Fall v. Donley, 2010 WL 2773340, at *9 (W.D. Mo. July 13, 2010) (citing Piziali v. Grand View College, 208 F.3d 218 (unpublished table decision), 2000 WL 227905, at *1 (8th Cir. Feb. 11, 2000) (requested accommodations were unreasonable because they would have required reassigning other employees to perform the plaintiff's duties or eliminating essential functions of her job)). Because plaintiff fails

to show she could perform her job duties with or without a reasonable accommodation, she does not make a prima facie showing that she was a qualified individual under the Rehabilitation Act. Defendant is therefore entitled to summary judgment on this claim.

### 2. *Plaintiff Did Not Suffer an Adverse Employment Action*

An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage.  See Cossette v. Minnesota Power & Light, 188 F.3d 964, 972 (8th Cir. 1999).  Defendant argues that plaintiff did not suffer an adverse employment action, and instead voluntarily took disability retirement from USPS.  The Court agrees.

Formal criticisms or reprimands that are not accompanied by additional disciplinary action such as a negative change in grade, salary or other benefits, do not constitute adverse employment actions.  Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1058 (8th Cir. 2007); see, e.g., Higgin v. Gonzales, 481 F.3d 578, 587 (8th Cir. 2007) (supervisor's recommendation that plaintiff be terminated from employment was not an adverse employment action where plaintiff was not terminated), abrogated on other grounds by Torgerson, 643 F.3d at 1043; Singletary v. Missouri Dep't of Corr., 423 F.3d 886, 892 n.5 (8th Cir. 2005) (plaintiff's placement on administrative leave pending an investigation by his employer was not an adverse employment action where he maintained his pay, grade, and benefits during the investigation and was returned to his position when the investigation ended); see also Johnson v. Runyon, 137 F.3d 1081, 1082 (8th Cir. 1998) (per curiam) (postal worker did not suffer an adverse employment action where he chose voluntary early retirement after learning he had not been selected for a newly created position).

Although USPS proposed that plaintiff be removed from employment, she was neither fired nor removed.  Plaintiff's separation from USPS occurred when she was granted disability retirement. Plaintiff voluntarily applied for disability retirement months prior to the imposition of any discipline,

because she felt that her disabilities made her unable to work.  Plaintiff was able to use all of her sick leave so she was paid while off of work for over a year.  Ex. J at 46:9-21, 49:11-18.  Plaintiff's pay was not decreased nor was she demoted during the time she was off of work.  The disciplinary letters and pending removal action that plaintiff complains of did not detrimentally alter the terms or conditions of her employment, and do not constitute adverse employment actions.

"A nonmoving party who bears the burden of proof at trial must 'make a showing sufficient to establish the existence of an element essential to that party's' claim at the summary-judgment stage, for 'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'"  Spaulding v. Conopco, Inc., 740 F.3d 1187, 1191-92 (8th Cir. 2014) (quoting Celotex, 477 U.S. at 322-23).  Plaintiff has failed to make such a showing, and defendant is therefore entitled to summary judgment on her Rehabilitation Act discrimination claim.

### 3. Plaintiff Was Not Denied a Reasonable Accommodation

As part of her prima facie case, plaintiff must make a facial showing she sought a "reasonable accommodation that imposes no undue burden on the employer[.]"  Peebles, 354 F.3d at 767.  Defendant argues that plaintiff did not request an accommodation, pointing to her EEO Investigative Affidavit, signed under penalty of perjury, which stated plaintiff "would not need any accommodations to perform the duties of [her] position, because [her] mind is not where it should be to be an instructor and [her] body functions would not let [her] perform [her] duties."  Ex. J at 97:16-98:6; Ex. S at 11.  Plaintiff testified she was unaware of any other positions she could have performed with her disabilities and agreed that Dr. Haymon did not think it would be good for her to return to work, and that his doctor's notes did not contain any references to work restrictions or accommodations. Ex. J at 39:20-39:24, 40:9-41:9, 97:7-97:15; Ex. B.  Summary judgment is proper

where a plaintiff never requested an accommodation. <u>See</u> <u>Turner v. Shinseki</u>, 2010 WL 2555144, at *5 (E.D. Mo. June 22, 2010).

Defendant concedes, however, that plaintiff made conflicting written statements. Plaintiff's application for disability retirement includes a statement that she asked for accommodations of being placed back in her original assignment of working in PEDC only (instead of working in two units), and that she be placed on a "higher level," meaning a two-level promotion and pay raise. Plaintiff testified similarly in her deposition. Ex. J at 106:13-107:5, 108:8-109:15.

Assuming for purposes of summary judgment that plaintiff sought these accommodations, the requested accommodations are not reasonable. An employer need not offer a promotion or raise as a reasonable accommodation. <u>See</u> <u>Kallail v. Alliant Energy Corp. Servs., Inc.</u>, 691 F.3d 925, 933 (8th Cir. 2012) (rejecting argument that employer should have accommodated ADA plaintiff by hiring her for an administrator position two grades above her position); <u>Nyrop v. Independent Sch. Dist. No. 11</u>, 616 F.3d 728, 737 (8th Cir. 2010) (under ADA and Rehabilitation Act, teacher "was not entitled to an administrative position as an accommodation."); <u>Cravens v. Blue Cross and Blue Shield of Kansas City</u>, 214 F.3d 1011, 1019 (8th Cir. 2000) (under ADA, "promotion is not required; '[a]n employer may reassign an employee to a lower grade and paid position if the employee cannot be accommodated in the current position and a comparable position is not available.'") (quoted case omitted).

Similarly, plaintiff's request that she only work in PEDC, and not work in a second unit, was not a reasonable accommodation as it would require the elimination of an essential function of her job. "It is well settled that an employer is under no obligation to reallocate the essential functions of a position that a qualified individual must perform." <u>Alexander v. Northland Inn</u>, 321 F.3d 723, 728 (8th Cir. 2003). Essential functions are "the fundamental job duties of the employment position

the individual with a disability holds or desires." Id. at 727. The employer's judgment is highly probative in determining whether a duty is an essential function. Id.

The job description for Human Resources Specialists states that the functional purpose is to "perform[] technical staff work in support of the implementation and administration of *one or more* human resources programs." Ex. J at 13:13-13:21; Ex. 1 (emphasis added). Personnel was one of the seven units in Human Resources, as was PEDC. Ex. J at 13:15-14:12, 15:11-15:13; Ex. V. According to Spirk, the Acting Manager of PEDC, the ability to work in one or more units within Human Resources was a required function of plaintiff's position. Ex. V. Not every unit had enough work to keep Human Resources Specialists busy on a full-time basis, so Human Resources Specialists were assigned to multiple units in order maximize the efficiency of the Human Resources department following the economic downturn. Ex. V. Accordingly, the ability to work in one or more units within Human Resources is an essential function of plaintiff's job as a Human Resources Specialist and her request to only work in one unit was not reasonable. See Alexander, 321 F.3d at 728 (hotel housekeeper's request that she be excused from vacuuming was not reasonable because it would have required her employer to reassign her vacuuming duties, which were an essential function of her job, to another employee for an indefinite period).

Because plaintiff fails to make a sufficient showing to establish the existence of her request for a reasonable accommodation from USPS, she fails to establish an element essential to her claim, and defendant is entitled to summary judgment on plaintiff's Rehabilitation Act on this basis as well. See Celotex, 477 U.S. at 322-23.

C.  Defendant's Motion for Summary Judgment on Plaintiff's Title VII Race Discrimination
    Claims

Plaintiff's race discrimination claims are evaluated under the three-part analytical framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973), and later refined in subsequent Supreme Court decisions.  See Whitley v. Peer Review Sys., Inc., 221 F.3d 1053, 1055 (8th Cir. 2000), abrogated on other grounds by Torgerson, 643 F.3d at 1043.  "Once the plaintiff has established a prima facie case, the employer has the burden of explaining its actions with legitimate, nondiscriminatory reasons.  If the employer puts forth legitimate reasons for its actions, the burden shifts back to the plaintiff to show that the employer's stated reasons were a pretext for discrimination."  Whitley, 221 F.3d at 1055 (internal citation omitted).

To establish a prima facie case of race discrimination, plaintiff must show that (1) she is a member of a protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) "the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)."  Gibson v. American Greetings Corp., 670 F.3d 844, 853-54 (8th Cir. 2012) (quoted case omitted).  At the prima facie stage, the Eighth Circuit applies a "low-threshold standard."  Doucette v. Morrison Cnty., Minn., 763 F.3d 978, 982 n.6 (8th Cir. 2014).  "[A] prima facie case requires only a minimal showing before shifting the burden to the employer."  Id. (quoted case omitted).

It is undisputed that plaintiff is a member of a protected class.  Defendant moves for summary judgment on plaintiff's race discrimination claim on the bases that she (1) was not qualified for her position as a Human Resources Specialist based on her physical and mental conditions; (2) did not suffer an adverse employment action; and (3) has not identified any similarly situated employees who received more favorable treatment.

### 1. *Plaintiff Was Qualified for Her Position*

Defendant argues that plaintiff was not qualified for her position "from a physical/mental standpoint" because her mental and physical health concerns prevented her from attending work for over a year. Although the facts of this case would seem to present a close question on the issue, defendant's argument applies a higher standard than the minimal showing required to establish a prima facie case. "Under the qualification prong, a plaintiff must show only that he possesses the basic skills necessary for performance of the job, not that he was doing it satisfactorily. . . . Where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." McGinnis v. Union Pacific R.R.,496 F.3d 868, 874 n.2 (8th Cir. 2007) (internal quotation marks, quoted case and brackets omitted); see also Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010) (district court erred in considering plaintiff's tardiness at the prima facie stage of the analysis where the record did not indicate plaintiff "failed to meet expectations other than the tardiness and unavailability Yellow offers as its reasons for firing him."). For purposes of summary judgment, the Court will assume without deciding that plaintiff was qualified for her position.

### 1. *Plaintiff Did Not Suffer an Adverse Employment Action*

To establish a prima facie case, a discrimination plaintiff has the burden to prove the existence of an employment action that adversely and materially altered the terms or conditions of her employment. See Altonen v. City of Minneapolis, 487 F.3d 554, 560 (8th Cir. 2007). As discussed above in connection with plaintiff's Rehabilitation Act, plaintiff was not subjected to a tangible change in working conditions that produced a material employment disadvantage. See Cossette, 188 F.3d at 972. Although USPS proposed that plaintiff be removed from employment, she was neither fired nor removed and she suffered no decrease in grade level, salary or other

benefits. Formal criticisms or reprimands, as here, that are not accompanied by additional disciplinary action such as a negative change in grade, salary or other benefits, do not constitute adverse employment actions. Elnashar, 484 F.3d at 1058. Therefore, the disciplinary letters and pending removal action that plaintiff asserts were racially motivated did not detrimentally alter the terms or conditions of her employment, and were not adverse employment actions. Further, plaintiff was not terminated, but voluntarily took disability retirement, so this was also not an adverse employment action.

Because plaintiff fails to make a sufficient showing to establish the existence of an adverse employment action, she fails to establish an element essential to her Title VII race discrimination claim and defendant is entitled to summary judgment on the claim on this basis. See Celotex, 477 U.S. at 322-23.

Defendant also argues that plaintiff cannot show an issue of fact as to whether she was treated less favorably than non-African-American similarly situated employees. This argument concerns the fourth element of the prima facie case, which requires plaintiff to show that the circumstances of her case give rise to an inference of discrimination. Because plaintiff cannot establish that she suffered an adverse employment action, and therefore cannot establish a prima facie case, the Court does not reach defendant's argument. Further, because plaintiff did not establish a prima facie case and the burden therefore never shifted to defendant, see Whitley, 221 F.3d at 1055 (describing analytical framework), the Court also does not reach defendant's argument that it had a legitimate, non-discriminatory reason for proposing plaintiff's removal.

D.  Defendant's Motion for Summary Judgment on Plaintiff's Harassment Claims

Plaintiff also alleges in her Complaint that she was discriminated against when USPS harassed her by sending her discipline letters, suspension letters and a removal letter even though

plaintiff provided doctor's notes for her absences. The complaint does not indicate whether this allegedly harassment was based on plaintiff's disability, her race, or both. Defendant moves for summary judgment on this claim, arguing that plaintiff failed to exhaust her administrative remedies and does not allege any conduct that constitutes harassment under the law.

### 1. Plaintiff Failed to Exhaust Administrative Remedies

"Administrative remedies must be exhausted before a federal employee may bring an employment discrimination claim against a federal employer." McAlister v. Secretary of Dep't of Health and Human Services, 900 F.2d 157, 158 (8th Cir. 1990) (citing Morgan v. United States Postal Service, 798 F.2d 1162 (8th Cir. 1986)). Exhaustion of administrative remedies is required for claims of discrimination under Title VII, Coons v. Mineta, 410 F.3d 1036, 1039 (8th Cir. 2005), and the Rehabilitation Act, Gardner, 752 F.2d at 1278. Failure to exhaust such remedies is fatal to claims of federal employment discrimination. Id.; Brown v. General Services Admin., 425 U.S. 820, 835 (1976).

As a federal employee, plaintiff must follow administrative procedures and exhaust administrative remedies by raising a claim of discrimination in an EEO complaint. The scope of any subsequent federal court action is defined by the claims that were actually filed in the prior EEO complaint or claims that are like or reasonably related to the claims asserted therein. Brown, 425 U.S. at 832; Anderson v. Block, 807 F.2d 145, 148 (8th Cir. 1986). "[T]he sweep of any subsequent judicial complaint may be only as broad as the scope of the EEOC investigation which could reasonably be expected to grow out of the charge of discrimination." Duncan v. Delta Consol. Indus., Inc. 371 F.3d 1020, 1025 (8th Cir. 2004) (internal quotation marks, bracket and quoted case omitted), abrogated on other grounds by Torgerson, 631 F.3d at 1043. "Allegations outside the scope of the EEOC charge . . . circumscribe the EEOC's investigatory and conciliatory role, and for

that reason are not allowed." Id. (quoting Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 836 (8th Cir. 2000), abrogated on other grounds by Torgerson, 643 F.3d at 1043).

The Court is mindful that plaintiff filed her EEO complaint pro se, and therefore construes it liberally. Nonetheless, "there is a difference between liberally reading a claim which 'lacks specificity,' . . . and inventing . . . a claim which simply was not made." Shannon v. Ford Motor Co., 72 F.3d 678, 685 (8th Cir. 1996). Plaintiff's EEO Complaint of Discrimination did not mention the letters or harassment. Ex. R. Plaintiff's EEO Investigative Affidavit indicates that the accepted issue under investigation is that plaintiff "alleged discrimination based on Race (African-American) and Disability (Stress) when: On February 2, 2012, she received an amended Letter of Decision upholding her Proposed Removal effective January 28, 2012." Ex. S at 1. Similarly, the EEOC's denial decision indicates that plaintiff's EEO complaint was limited to allegations of race and disability discrimination when she was removed from her position as a Human Resources Specialist effective January 28, 2012. Doc. 1-1 at 1. Neither EEOC filing references a claim of harassment.

In Kells, the district court found that the EEOC charge "failed to put the Defendant on notice that Kells was claiming he was subject to harassment." Kells, 210 F.3d at 836. Kells' EEOC charge asserted he had been removed from his position due to his disability and that the employer's actions "were taken in an effort to force [him] to resign." Id. The district court dismissed Kells' harassment claims, finding he failed to exhaust his administrative remedies as to those allegations. Id. The Eighth Circuit agreed, finding "Kells' claim that he was unlawfully subject to verbal harassment by [one employee] is not reasonably related to his claims of discriminatory demotion and termination at the hands [of another employee]." Id. The EEOC charge "failed to put the Defendant on notice that Kells was claiming he was subject to harassment." Id.

The Court finds that plaintiff did not administratively exhaust remedies for her claim of racial or disability harassment, as her EEO complaint did not put USPS on notice that she was claiming she was subject to harassment. Morever, a claim of harassment is not sufficiently like or related to the claims she did exhaust. Plaintiff's racial and disability harassment claims should therefore be dismissed.

### 2. *Plaintiff Fails to Allege Actionable Racial or Disability Harassment*

Defendant argues that even if plaintiff had exhausted her harassment claims, she fails to establish a prima face case of either disability or racial harassment because the conduct she complains of was not severe enough to affect the terms, conditions or privileges of her employment. The Court agrees.

"To establish a claim for hostile work environment based on race, an employee must prove that '(1) [s]he is a member of a protected group; (2) [s]he was subject to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of employment." Clay v. Credit Bureau Enters., Inc., 754 F.3d 535, 540 (8th Cir. 2014) (quoted case omitted). Similarly, to establish a hostile work environment based on disability, plaintiff must show that (1) she is a member of the class of people protected by the statute, (2) she was subject to unwelcome harassment, (3) the harassment resulted from her membership in the protected class, and (4) the harassment was severe enough to affect the terms, conditions or privileges of her employment. Sellers v. Deere & Co., 791 F.3d 938, 945 (8th Cir. 2015).

"In order to be actionable, harassment must be both subjectively hostile or abusive to the victim and 'severe and pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'" Shaver v.

Independent Stave Co., 350 F.3d 716, 721 (8th Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)).  Anti-discrimination laws do not establish codes of civility in the workplace and "[c]onduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law."  Id.  To determine whether the harassment affected a term, condition or privilege of employment, courts must "consider the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with [plaintiff's] job performance."  Sellers, 791 F.3d at 945 (quoted case omitted).

a)  <u>Plaintiff Was Not Subjected to Racial Harassment</u>

Plaintiff's racial harassment claim is based solely on the letters sent by Spirk and Meehan requesting doctor's notes and attempting to impose discipline upon her.  Ex. J at 118:19-120:13. Plaintiff admits that the disciplinary letters only related to the fact that she was out on sick leave and did not mention her race.  Ex. J at 80:13-80:24, 85:6-85:20, 120:14-120:18.  There is no explicit or implicit reference to plaintiff's race in any of the letters sent by Spirk or Meehan.  See Exs. C, D, F, G, H, I, K, L, M, O, P.  When asked whether there was anything that made plaintiff think this alleged harassment was related to her race, plaintiff testified she was unable to say there was any relation to her race:

> I can't say per se.  I just don't – I think it's the position.  I can't say that she was doing it to me because I was black.  I can't say that.  I – I think she wanted the position, and if I think in ter0ms of race is if she fired me and hired someone white, then I could say it, she could have fired me and hired somebody black, so I don't – I can't – I can't really say.

Ex. J at 120:19-121:3.

The letters about which plaintiff complains are racially neutral and come nowhere near the level of severe or pervasive racial harassment necessary to survive summary judgment.  See, e.g.,

<u>Smith v. Fairview Ridges Hosp.</u>, 625 F.3d 1076, 1086-87 (8th Cir. 2010) (holding that comments about racial stereotypes were of insufficient severity to constitute actionable harassment), <u>abrogated on other grounds by</u> <u>Torgerson</u>, 643 F.3d at 1043; <u>Singletary.</u>, 423 F.3d at 893 (requiring more for actionable harassment than a few instances of allegedly racist comments over a course of years); <u>compare</u> <u>Green v. Franklin Nat'l Bank of Minneapolis</u>, 459 F.3d 903, 911-12 (8th Cir. 2006) (work environment was hostile where plaintiff was called racially insensitive terms, including "monkey" and "chimpanzee" eight times in a three-month time frame); <u>Reedy v. Quebecor Printing Eagle, Inc.</u>, 333 F.3d 906, 908-09 (8th Cir. 2003) (five incidents of harassment within seven months was actionable).

Assuming for purposes of summary judgment that plaintiff administratively exhausted her racial harassment claim, defendant is entitled to judgment on this claim because the conduct she complains of is not severe or pervasive enough to constitute actionable harassment based on her race.

b) <u>Plaintiff Was Not Subjected to Disability Harassment</u>

Plaintiff's disability harassment claim is also based solely on the letters sent by Spirk and Meehan requesting doctor's notes and attempting to impose discipline upon her. Plaintiff agrees that the Notice of Proposed Removal and Letter of Decision upholding the removal do not contain any specific references to her disability or diagnoses. Ex. J at 80:6-80:12, 85:21-85:24. Plaintiff never mentioned her diagnosis of depression to Spirk and only vaguely referenced her anxiety in terms of complaining that she was stressed, anxious and could not handle her job. Ex. J at 44:7-45:11. Spirk only learned of plaintiff's anxiety and depression diagnoses after she issued the Proposed Notice of Removal. Ex. U. Plaintiff also testified she did not tell Meehan about these diagnoses until after Meehan after had announced her decision to uphold the proposed removal. Ex. J at 45:12-46:8.

There is no evidence to suggest that either Spirk or Meehan knew about plaintiff's specific disabilities prior to their decision to propose her removal.

The allegedly harassing letters sent by Spirk or Meehan by their own terms do not contain any language that could be construed as harassment based on disability. The letters' contents are nowhere close to the level of being sufficiently severe or pervasive to support a claim of harassment based on disability. See Sellers, 791 F.3d at 945 (two incidents of offensive conduct in which supervisor yelled at plaintiff, berated him, and engaged in extreme behavior such as spitting, pushing furniture, and pounding his fists, while severe, were isolated and did not affect a term, condition or privilege of his employment); Ryan v. Capital Contractors, Inc., 679 F.3d 772, 775, 779 (8th Cir. 2012) (supervisor's behavior in calling employee with mental disability a "fucking dummy," "fucking retard," "stupid," "idiot," and "numb nuts" was inappropriate and likely subjectively offensive, but it failed to rise to the level of extreme behavior that was objectively offensive, as required to constitute hostile work environment in violation of ADA, considering the totality of the circumstances; the employee had participated in similar offensive conduct toward supervisor, the two had often exchanged "charley horses" and "titty twisters" and regularly punched each other, and because the employee had the continued ability to perform his duties, his supervisor's conduct did not seriously affect the terms, conditions, or privileges of his employment); Shaver, 350 F.3d at 721-22 (testimony from plaintiff's coworkers that unspecified managers said he was too stupid to be promoted, along with coworker's and supervisors' references to plaintiff as "platehead," were insufficient for plaintiff's disability harassment claim to survive summary judgment); Hannoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1047-48 (8th Cir. 2003) (supervisor's repeated criticism of plaintiff's leadership and written communication skills were not harassment based on race or national origin); Stipe v. Shinseki, 690 F.Supp.2d 850, 883-84 (E.D. Mo. 2010) (employer's

"rejection of [plaintiff's] leave requests could not be considered objectively so 'severe or pervasive' as to alter the conditions of plaintiff's work environment because she continued to arrive to work late on a regular basis.").

Assuming for purposes of summary judgment that plaintiff administratively exhausted her disability harassment claim, defendant is entitled to judgment on this claim because plaintiff does not allege conduct that was severe or pervasive enough to constitute actionable harassment based on her disability.

## V.  Conclusion

For the foregoing reasons, the Court will deny plaintiff's motion for summary judgment, will grant defendant's motion for summary judgment on plaintiff's Rehabilitation Act and Title VII claims, and will dismiss plaintiff's racial and disability harassment claims.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's Motion for Summary Judgment is **DENIED**. [Doc. 21]

**IT IS FURTHER ORDERED** that defendant Megan Brennan's Motion for Summary Judgment is **GRANTED**.  [Doc. 22]

An appropriate judgment and order of dismissal will accompany this Memorandum and Order.

_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  _29th_  day of September, 2015.